UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHARLES SUNNYCALB,

                         Plaintiff,

       v.                                   Case No. 1:10-cv-192-HJW

CSX TRANSPORTATION, INC.,

                         Defendant.

## ORDER

       Pending is the defendant's renewed "Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial" (doc. no. 108). Plaintiff opposes the motion. Having fully considered the record, including the trial evidence, the parties' briefs, and applicable authority, the Court will __deny__ the motion for the following reasons:

## I. Background

       Plaintiff, a locomotive engineer, filed his complaint in this action on March 26, 2010, asserting a claim under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, and the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 et. seq. FELA is "a remedial and humanitarian statute . . . enacted by Congress to afford relief to employees from injury incurred in the railway industry." __Hardyman v. Norfolk & Western Railway Co.__, 243 F.3d 255, 257 (6th Cir. 2001) (quoting __Mounts v. Grand Trunk W. R.R.__, 198 F.3d 578, 580 (6th Cir. 2000)). "Congress intended FELA to be a departure from common law principles of liability as a 'response to the special needs of railroad workers who are daily exposed to the risks inherent in

railroad work and are helpless to provide adequately for their own safety.' " Id. (quoting Sinkler v. Missouri Pac. R.R. Co., 356 U.S. 326, 329 (1958)).

Plaintiff alleged that "[p]rior to departing with Locomotive 8160 . . . [he] had reported that the locomotive was foul-smelling and [CSX] sent an employee aboard who sprayed the locomotive with some chemical which temporarily removed the smell" (doc. no. 1 at ¶ 11). Plaintiff subsequently used the chlorinated toilet, closed the lid, and "[a]s he flushed the toilet, due to cracked plumbing in the locomotive and a rotted floor in the locomotive, air blew up through the flooring and blew the water from the toilet into Plaintiff's eyes and mouth" (¶ 9). He further alleged that while en route to the next stop, the foul smell returned and got worse, and "[a]ir continued to blow up through the locomotive floor, sending a mist of the dirty water around the cab" (¶¶ 10-11). Although plaintiff attempted to reduce the mist by slowing the train, he suffered breathing problems and burning eyes, and was subsequently diagnosed with reactive airway dysfunction syndrome ("RADS") and chemical conjunctivitis.[1]

Plaintiff brought suit against CSX, asserting that CSX had violated its duty to maintain the locomotive in a safe condition. Specifically, he alleged that CSX's "failure to provide a locomotive with a properly working flushing system, proper

---

1 As indicated at trial, the term "RADS" was first used by Dr. Stuart Brooks, M.D., and colleagues to describe an asthma-like illness after a single acute exposure to a respiratory irritant in an otherwise healthy individual. See RADS S.M. Brooks, M.A. Weiss, I.L. Bernstein, "Reactive airways dysfunction syndrome (RADS): persistent asthma syndrome after high level irritant exposures." Chest, Volume 88, 1985, 376-384.

plumbing and proper flooring" had allowed "toxic and dangerous fluids and materials from the toilet/plumbing system to blow up through the floor of the locomotive cab" (¶ 13(e)).

Given the locomotive's condition and repair history, CSX appropriately stipulated that the leaking toilet system on Locomotive 8160 was a violation of the LIA. Such violation constituted proof of negligence as a matter of law, but in order for plaintiff to prevail on his FELA claim, he still had to prove that his injuries resulted "in whole or in part" from CSX's negligence. 45 U.S.C. § 51. In light of the results of plaintiff's methacholine challenge test and the opinion of CSX's own medical expert (Dr. James Lockey), CSX acknowledged that plaintiff has the condition "RADS." The main issue remaining for trial was whether CSX's negligence, i.e., the leaking toilet system and holes in the floor, which in turn, led to the "blast" of liquid and the "mist" blowing around the cabin, played "any part, even the slightest" in causing plaintiff's injuries, including his RADS.

Prior to trial, CSX challenged the admissibility of the opinions of plaintiff's treating pulmonologist Dr. Sunil Dama, M.D., and medical expert Dr. Barry Levy, M.D. In doing so, CSX late-identified an additional expert witness, toxicologist Dr. Laura Green, Ph.D. and sought to introduce her testimony at the *Daubert* hearing and at trial. Plaintiff objected. At the *Daubert* hearing on June 12, 2012, the Court allowed Dr. Green to testify, subject to the sanction that CSX pay the resulting reasonable and necessary expenses incurred by plaintiff (doc. no. 54, Order on 5/25/2012). After the hearing, the Court found that the medical testimony and/or opinions of Drs. Dama and Levy were reliable and relevant and could be

introduced at trial (doc. no. 71, Order on 8/13/12). Over plaintiff's objection, the Court also allowed Dr. Green to testify at trial on the subject of general causation. As Dr. Green is not a physician and admittedly is not qualified to diagnose or treat a patient's medical condition, she was not permitted to offer an opinion on specific causation of plaintiff's illness or otherwise speculate about his diagnosis (e.g., that he might have been getting the "flu").[2]

On August 27, 2012, the jury trial commenced. Plaintiff's theory of the case was that his injuries were caused by his exposure to the chemicals contained in the blast of liquid and/or the "mist" in the cabin. Plaintiff introduced evidence that the locomotive's toilet system utilized water-soluble "slugs" composed of the chlorine-containing compound "trichloroisocyanuric acid" ("TCCA"). The Material Safety Data Sheet ("MSDS") specifically warned that the active chemicals in the slugs could cause the symptoms plaintiff had experienced, including lung impairment and eye irritation. The MSDS specifically indicated that "prolonged exposure" to the active chemicals "may cause damage to the respiratory system." Plaintiff testified that while operating the locomotive, he had breathed the "mist" for approximately 30 minutes.

In addition to various fact witnesses and his own testimony, plaintiff introduced the testimony of Drs. Dama and Levy. Documents regarding the toilets' history of problems and repairs, as well as a schematic of the layout of the toilet

---

**2** Dr. Green indicated she was a "chemist by training" with a Ph.D. in food science (doc. no. 109-5 at 33). She indicated her training at MIT was in three areas: "chemical engineering, microbiological, food microbiology in particular, and analytical chemistry" (Id.at 3).

system and the MSDS, were also introduced into evidence. Although it is undisputed that the toilet was leaking, the toilet had been replaced and disposed of by CSX prior to the lawsuit, and thus, was not available for inspection.

At the conclusion of plaintiff's case in chief, defendant ("CSX") orally moved to dismiss the case and asked for judgment in its favor (doc. no. 106 at 6-7, Transcript on 9/5/2012). CSX argued that there was insufficient evidence of exposure to any harmful substance that led to plaintiff's injuries. The Court denied the motion, indicating that evidence of record reflected that the chlorinated toilet system was leaking and there was enough evidence in the record for the jury to have to decide whether the resulting liquid and/or mist from the leaking toilet contained chlorine or chlorine compounds that caused plaintiff's injuries (Id. at 8). CSX also argued: 1) that the testimony regarding plaintiff's future prescription costs was speculative, and 2) that because the plaintiff now has health insurance, his claim for future damages was seeking a double recovery (Id. at 9). The Court took this under advisement (Id. at 10).

After the close of evidence, CSX moved for directed verdict on the same three grounds (doc. no. 103 at 10-13). The Court did not rule on the motion at that time and submitted the case to the jury (Id. at 15). The Court indicated that the special verdict form would have a separate line for any damages for future prescription costs (Id.).

The jury deliberated, and on September 7, 2012, returned a verdict in plaintiff's favor (doc. no. 99). The jury found that plaintiff had shown by the greater weight of the legal evidence that he was injured on April 2, 2007 while serving as

the engineer of Locomotive CSXT 8160, that he was exposed to chlorine or chlorine-containing compounds, that such exposure played a part, no matter how small, in bringing about his injuries, and that he suffered resulting damages. As part of the award of damages, the jury determined that the present value of prescription medications that the plaintiff is reasonably certain to need and receive in the future to be $108,000.00 (doc. no. 99, Special Verdict No. 7).

On October 5, 2012, CSX filed the present motion for judgment as a matter of law pursuant to Rule 50, or alternatively, for a new trial pursuant to Rule 59 (doc. no. 108). Plaintiff filed a brief in opposition (doc. no. 114), and CSX replied (doc. no. 115). This matter is ripe for consideration.

## II. Standard of Review

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

Fed.R.Civ.P. 50(a). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed.R.Civ.P. 50(b).

Judgment as a matter of law is granted only where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that

issue." <u>Reeves v. Sanderson Plumbing Prods., Inc</u>., 530 U.S. 133, 149, (2000). The court must consider the evidence and inferences reasonably drawn therefrom in the light most favorable to the non-movant "and give it the advantage of every fair and reasonable inference that the evidence can justify." <u>Rockwell Intern. Corp. v. Reg. Emergency Med. Services of NW Ohio, Inc.</u>, 688 F.2d 29, 31 (6th Cir. 1982); <u>Imwalle v. Reliance Medical Products, Inc.</u>, 515 F.3d 531, 543 (6th Cir. 2008).

A renewed motion for a judgment as a matter of law following an adverse jury verdict "may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences . . . reasonable minds could come to but one conclusion in favor of the moving party." <u>Static Control Components, Inc. v. Lexmark Intern., Inc.</u>, 697 F.3d 387, 414 (6th Cir. 2012) (quoting <u>Barnes v. City of Cincinnati</u>, 401 F.3d 729, 736 (6th Cir.), cert. denied, 546 U.S. 1003 (2005)).

<u>III. Discussion</u>

<u>A. Whether CSX is Entitled to "Judgment as a Matter of Law"</u>

FELA provides for liability when an injury results "in whole or in part" from the negligence of the employer. 45 U.S.C. § 51; <u>Rogers v. Missouri Pacific Railroad Co.</u>, 352 U.S. 500, 506 (1957) ("Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought"); <u>Daughenbaugh v. Bethlehem Steel Corp.</u>, 891 F.2d 1199, 1204 (6th Cir. 1989) (same).

Under Rule 50, CSX argues: 1) that "plaintiff elicited insufficient evidence at

trial to satisfy his burden as to whether he was exposed to chlorine or chlorine-containing compounds with a sufficient dose and duration to cause [RADS];" and 2) "to the extent that plaintiff relies upon the testimony of Dr. Barry Levy to satisfy his burden on causation, his claim fails because Dr. Levy's testimony should have been ruled inadmissible" (doc. no. 108 at 1).

CSX argues that the "plaintiff failed to adduce evidence of exposure to chlorine or chlorine-containing compounds" (doc. no. 109 at 8-9). On the contrary, the evidence indicated that the toilet system used chlorinated slugs and was leaking liquid onto the floor, which was pitted and corroded with holes. It was undisputed that when the slugs were dissolved in the toilet water, "hypochlorous acid" and other compounds would result. Even Mr. Penuel, the CSX manager for repairs, reluctantly acknowledged that chlorine (or more accurately, the chlorine-containing compounds from the slugs) could be present in the liquid on the floor. In fact, the evidence indicated that the toilet system was designed to chlorinate the sewage water and then release it upon the railroad tracks. It was undisputed that air moving through the holes in the corroded floor blew the chemically-disinfected fluid into the cabin in a "mist" while the train was moving. As Dr. Green suggested, fluid leaking onto the floor from the broken toilet system would also have been blown around the cabin in this mist. Plaintiff testified that he slowed the train in an effort to reduce the mist which was making him cough.

Although CSX urges that "only the freshwater holding tank" was leaking, CSX had disposed of the malfunctioning toilet, so plaintiff could not determine precisely what part of the toilet system was faulty or broken. Plaintiff's testimony

contradicted CSX's assertion that only "fresh water" was leaking, as he indicated it was immediately irritating and made him gasp when it blasted him in the face.

Although CSX argues that there is no evidence that plaintiff was exposed to the slugs in their solid form, CSX ignores the fact that the physical harm described by the MSDS is not limited to contact with the slugs in solid form. The MSDS warns that upon exposure to water, a "gas evolution" may occur and that "contact with small amount of water may result in an exothermic reaction with the liberation to (sic) toxic fumes." The MSDS further indicates that the active chemicals were "[c]orrosive to eyes, skin, and mucous membranes . . . [h]armful by inhalation and if swallowed . . . irritating to the nose, mouth, throat, and lungs . . . can result in shortness of breath, wheezing, choking, chest pain, and impairment of lung function."

Although CSX argues that the evidence does not show that a visible cloud of "chlorine gas" with a "pungent chlorine smell" was produced, Dr. Levy explained that one would see a yellowish-green cloud only if there was an "extremely intense concentration" of chlorine gas. Dr. Levy explained that aersolizing the toilet liquid (which, upon dissolution of the slugs, contained hypochlorous acid and other compounds) "wouldn't necessarily make it a gas" (doc. no. 109-1, Tr. at 25-26). The MSDS warned that upon contact with small amounts of water, the active chemicals in the slugs could create "toxic fumes." Such evidence was undisputed. Dr. Levy properly considered this information in his analysis of whether plaintiff had been exposed to a chemical irritant sufficient

to cause RADS. Based on the circumstances and evidence, the jury could reasonably find that plaintiff was exposed to chlorine or chlorine-containing compounds.

As to "dose and duration," CSX's argument is premised on the assertion that plaintiff had the burden to prove that the level of his chemical exposure could cause RADS (doc. no. 109 at 1, 8-9). CSX relies on <u>Pluck v. BP Oil Pipeline Co</u>., 640 F.3d 671, 676-77 (6th Cir. 2011), which was decided under state negligence law, not FELA. Pluck sought to attribute her cancer to long-term low-level exposure to benzene contained in well water contaminated by BP. The benzene in her well had been monitored and never exceeded EPA limits. The court observed that benzene is "a known carcinogen in sufficient doses" and that benzene is "ubiquitous in the ambient air and is a component or constituent of vehicle exhaust and cigarette smoke," and found that the plaintiff's expert had not "ruled in" these other sources. <u>Id</u>.at 674. Pluck had been exposed to benzene from multiple sources over many years, including her own long-term smoking habit. She failed to produce admissible evidence that her low-level exposure to the benzene in her well caused her medical condition, and thus, summary judgment was granted in the defendant's favor. <u>Id</u>. at 677 (citing <u>Valentine v. PPG Industries, Inc</u>., 158 Ohio App.3d 615 (2004) ("the cause of brain tumors is largely unknown . . . [a]t this point, medical science does not enable physicians and other scientists to pinpoint a cause of brain cancer")).

Unlike <u>Pluck,</u> the present case under FELA involves a sudden exposure from a single source resulting in immediate symptoms in an otherwise healthy

person. Plaintiff had no prior diagnosis of asthma. His chemical exposure was unexpected and could not be measured after-the-fact, as it occurred suddenly in a situation where the level of that chemical is not ordinarily monitored. In such circumstances, this circuit and others have held that evidence of the precise level of chemical exposure is not necessary when other evidence supports the claim. See Best v. Lowe's Home Centers, Inc., 563 F.3d 171, 178 (6th Cir. 2009) (where pool chemicals suddenly spilled onto customer's face at a store, no precise "dose" was required in order to prove causation, as jury could reasonably infer exposure was substantial); Gass v. Marriott Hotel Services, 558 F.3d 419, 431 (6th Cir. 2009) (the fact that plaintiffs did not know exactly which insecticide they were exposed to in their hotel room did not preclude them from establishing causation in their negligence action); Hardyman, 243 F.3d at 265 ("Such a [dose] requirement essentially would foreclose plaintiffs from recovering . . . against negligent employers unless their particular job has been the subject of a national, epidemiological study"); Harbin, 921 F.2d at 132 (jury could draw the inference that the soot stirred up in boiler cleaning was so significant as to create a safety concern necessitating additional action by the railroad); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999) ("it is usually difficult, if not impossible, to quantify the amount of exposure. . . such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure"); Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1059-60 (9th Cir. 2003) (same).

To the extent CSX argues that Dr. Levy's testimony was inadmissible for this

reason, Dr. Levy pointed out that the case literature reflects that most RADS cases do not have information available as to the precise level of a patient's chemical exposure. This circuit and others have held that evidence of the exact level of chemical exposure, though helpful, is not always necessary for an expert to reliably indicate that sudden chemical exposure caused a plaintiff's injury. See Best, 563 F.3d at 178; Gass, 558 F.3d at 434; Westberry, 178 F.3d at 265 ("such evidence . . . need not invariably provide the basis for an expert's opinion on causation"); Heller v. Shaw Industries, Inc., 167 F.3d 146, 157 (3d Cir. 1999) ("even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness").

In fact, expert testimony itself is not always necessary for a jury to conclude that the defendant's negligence caused the plaintiff's injuries. See Hardyman, 243 F.3d at 260 (a jury question can be created even without expert testimony on the question of specific causation); Gass, 558 F.3d at 434 (expert testimony not required to prove causation where plaintiffs were exposed to pesticides and immediately developed respiratory injuries); Ulfik v. Metro–North Commuter R.R., 77 F.3d 54, 59-60 (2d Cir. 1996) (jury could properly infer that exposure to paint fumes caused plaintiff's headaches, nausea and dizziness without the need for expert testimony in FELA action); Lynch v. NE Regl. Commuter R.R. Corp., 700 F.3d 906, 916 (7th Cir. 2012) ("in FELA cases the element of causation may be established through circumstantial evidence"); Missouri Pacific R.R. Co. v. Kansas Gas and Elec. Co., 862 F.2d 796, 800 (10th Cir. 1988) (causation in FELA case may be established through circumstantial evidence and expert testimony is not

always required); <u>Harbin</u>, 921 F.2d at 132 ("We decline the Railroad's invitation to constrict the generous provisions of the statute by imposing upon FELA claimants the burden to produce such technical scientific evidence."); <u>Myers v. Ill. Central R.R. Co.</u>, 629 F.3d 639, 643 (7th Cir. 2010) (expert testimony unnecessary in cases where the layperson can understand what caused the injury); <u>Wills v. Am. Hess Corp.</u>, 379 F.3d 32, 46 (2d Cir. 2004) (in FELA action, expert testimony necessary only if causal link is beyond the knowledge of the lay juror, such whether exposure to toxin caused a particular cancer).

Here, the evidence indicated that the locomotive's toilet system had a chlorinator, that the toilet system was leaking, that liquid from the some part of the toilet system was sprayed into plaintiff's face and was immediately irritating, that aersolized liquid was "misted" into the cabin through holes in the corroded floor, that the MSDS sheet specifically warned that exposure to the active chemicals in the chlorinator slugs can cause breathing difficulties, lung damage, and eye irritation, and that plaintiff – who did not have a history of asthma – was then diagnosed with "RADS" and chemical conjunctivitis.

While CSX correctly points out that the mere fact that two events correspond in time and space does not necessarily mean they are causally related, "a temporal relationship between exposure to a substance and the onset of a disease ... can provide compelling evidence of causation." <u>Clausen</u>, 339 F.3d at 1060 (quoting <u>Westberry</u>, 178 F.3d at 265); see also, <u>Heller</u>, 167 F.3d at 154; <u>Zuchowicz v. United States</u>, 140 F.3d 381, 385-390 (2d Cir. 1998) (observing that the

physician's conclusion "was based on the temporal relationship between the overdose and the start of the disease and the differential etiology method of excluding other possible causes" and holding that "the defendant's attack on the district court's finding of causation is meritless").

It was impossible under the circumstances of this case for the plaintiff to establish a precise level of his chemical exposure. Nonetheless, he introduced evidence of his substantial exposure to fluids from the leaking toilet system. He was "blasted in the face" with liquid and breathed a "mist" in the cabin for approximately 30 minutes. Plaintiff testified that when he first inhaled after the toilet malfunctioned, it was like inhaling "sandpaper" and that his eyes began to burn. The MSDS specifically warned that exposure to the substances in the chlorine slugs could cause lung impairment and eye irritation. The evidence was sufficient for the jury to draw the reasonable inference that CSX's negligence played a part in plaintiff's injuries. See Harbin v. Burlington Northern R. Co., 921 F.2d 129, 132 (7th Cir. 1990) ("[a] long line of FELA cases reiterate the lesson that the statute vests the jury with broad discretion to engage in common sense inferences regarding issues of causation and fault").

In summary, the evidence showed that: 1) the locomotive's toilet had a "chlorinator" to treat waste flushed into a holding tank; 2) the chlorinated slugs would dissolve in the liquid; 3) the MSDS for the active chemical in the slugs indicated it is "[c]orrosive to eyes, skin, and mucous membranes . . . [h]armful by inhalation and if swallowed . . . "irritating to the nose, mouth, throat, and lungs . . .

can result in shortness of breath, wheezing, choking, chest pain, and impairment of lung function;" 4) the MSDS further indicated that "after spillage/leakage, hazardous concentrations in air may be found in local spill area and immediately downwind" and cautioned "do not put water on this product as a gas evolution may occur;" 5) the toilet was leaking liquid onto the floor of the locomotive; 6) the floor was corroded and had holes in it, 7) the toilet malfunctioned and sprayed liquid into plaintiff's mouth and eyes, 8) plaintiff then breathed for approximately 30 minutes a "mist" that blew up through the holes in the corroded floor; 9) even when operating as intended, the toilet would discharge the chemically-disinfected water onto the railroad tracks; 10) during the incident, plaintiff was coughing and had burning eyes; 11) he sought medical care and was subsequently diagnosed with "chemical conjunctivitis" of the eyes and reactive airway dysfunction syndrome ("RADS") by separate physicians; and 12) plaintiff had no prior history of asthma.

The trial evidence also included the testimony of treating physician Dr. Sunil Dama and medical expert Dr. Barry Levy. Dr. Dama conducted numerous diagnostic tests and ruled out other possible causes before diagnosing plaintiff with RADS. Dr. Levy exhaustively reviewed the medical literature regarding RADS and the effects of exposure to chlorine and/or chlorine-containing compounds. He also reviewed plaintiff's medical records and concluded that the sudden chemical exposure to chlorine or chlorine-containing compounds could generally cause, and in this case, did specifically cause, plaintiff's injuries. Both physicians used

the well-accepted method of differential diagnosis and/or etiology, which is an appropriate method for determining what a person suffers from and what caused the illness. Glaser v. Thompson Med. Co., 32 F.3d 969, 977 (6th Cir. 1994); Hardyman, 243 F.3d at 260–61. "Many courts, including our own, allow experts to employ a rule-in/rule-out reasoning process for etiology as well as diagnosis." Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 673-74 (6th Cir. 2010), cert. denied, 131 S.Ct. 2454 (2011).

The trial evidence also included the testimony of the defense medical experts, pulmonologist Dr. James Lockey, M.D., and toxicologist Dr. Laura Green Ph.D., who both agreed that inhaling an irritant in sufficient quantity and concentration could cause RADS. After reviewing plaintiff's medical records and the results of plaintiff's methacholine challenge test, Dr. Lockey agreed that plaintiff has the condition "RADS."

Viewing the trial evidence as a whole in the light most favorable to plaintiff for purposes of Rule 50, the Court finds that CSX is not entitled to judgment as a matter of law.

## B. Future Damages for Future Prescription Medication

At the close of evidence, CSX orally argued that the testimony regarding plaintiff's future prescription costs was "speculative" and that because plaintiff now has health insurance through his current employer, recovery of future prescription costs would amount to a "double recovery" (doc. no. 103 at 10-13). The Court notes that defendant has not reasserted these issues in its written motion and that such issues may be waived. In any event, the Court finds that the

jury had a legally sufficient evidentiary basis to award future prescription costs to plaintiff. See Reeves, 530 U.S. at 149.

Dr. Dama testified that plaintiff developed RADS six years ago in 2007, that plaintiff still requires prescription medications for treatment, and that plaintiff was likely to continue to have these problems. Although Dr. Dama candidly testified that he could not say for certain that plaintiff's RADS would not improve at some point in the future, the evidence reflects that, to date, plaintiff must still take various prescription medications for his ongoing serious breathing difficulties, which were readily apparent to the jury at trial. As treating physician, Dr. Dama explained that plaintiff's condition ("RADS") may be better or worse on certain days and that this is largely a function of whether plaintiff was exposed to conditions that exacerbate his breathing problems, such as vehicle exhaust, smoke, perfumes, and air pollution.

Dr. Dama was realistic in his assessment that plaintiff would likely continue to have RADS and need ongoing medical treatment for it. The fact that Dr. Dama refused to entirely abandon all hope that plaintiff's RADS (which has persisted for six years already) might someday improve does not mean that the jury's verdict regarding plaintiff's need for future prescription medications was thereby rendered "speculative." Given the medical testimony, the jury had an adequate evidentiary basis for its determination that the plaintiff is reasonably certain to need future prescription medications (doc. no. 99, Special Verdict No. 7).

CSX also orally argued that plaintiff has acquired health insurance through his current employer and that such insurance would cover the costs of plaintiff's

future prescription medications (doc. no. 103 at 10-13). CSX argued that plaintiff was essentially seeking a "double recovery." Plaintiff pointed out that his economic expert testified that he had taken the plaintiff's current insurance into account in his calculations of damages. Plaintiff also pointed out that his health insurance is a "collateral source," and that regardless of the availability of insurance, the defendant is still responsible for the injuries and damages it caused to plaintiff. CSX is not entitled to judgment as a matter of law on these issues.

## C. Whether Defendant is Entitled to a New Trial under Rule 59

Alternatively, CSX requests a new trial under Rule 59(a)(1), which provides: "[t]he court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1). A new trial is appropriate when the jury reaches a "seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Static Control, 697 F.3d at 414 (quoting Mike's Train House, 472 F.3d at 405)); Holmes v. City of Massillon, 78 F.3d 1041, 1045–46 (6th Cir.), cert. denied, 519 U.S. 935 (1996).

CSX moves for a new trial on five grounds: 1) the jury's verdict on causation was against the weight of the trial evidence; 2) Dr. Levy's testimony should have been excluded; 3) CSX should have been permitted to impeach Dr. Levy's qualifications by eliciting testimony about the occasions where his expert testimony has been rejected; 4) Dr. Green's testimony should not have been

limited; and 5) the jury should have been given CSX's proposed instruction on causation.

Based on the evidence already discussed, the jury's verdict was not against the weight of the trial evidence. As to causation, the jury could draw reasonable inferences from the circumstantial evidence presented. For the reasons already discussed herein and in the *Daubert* Order (doc. no. 71, Order on 8/13/12), Dr. Levy's opinion was based on a reliable methodology and was admissible. CSX is not entitled to a new trial on these grounds. Although CSX assumes that the jury could not have rendered a verdict without Dr. Levy's expert testimony (doc. no. 109 at 14), the relevant case law and the weight of circumstantial evidence in this case suggest otherwise. The jury verdict would likely still stand, even without Dr. Levy's expert testimony.

CSX further argues that it should have been allowed to impeach Dr. Levy's qualifications by eliciting testimony about the 11 occasions where some or all of his expert testimony was excluded (as opposed to the hundreds of cases where his testimony was apparently found reliable and relevant). Questioning about exclusion (or admission) of his testimony in these other cases would have wasted a substantial amount of time, and in light of the necessarily fact-specific circumstances for the decisions in those cases, would have served little purpose here. Plaintiff points out that there was nothing in those opinions to suggest that Dr. Levy ever lied or deliberately provided misinformation under oath (doc. no. 114 at 15). CSX assails what it characterizes as Dr. Levy's "shoddy reasoning" but this essentially amounts to a disagreement as to Dr. Levy's analysis and conclusions,

not his truthfullness. Dr. Levy's analysis and conclusions were properly subject to extensive cross-examination at trial. The United States Supreme Court has observed that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence. Daubert, 509 U.S. at 596. CSX was afforded such opportunity throughout the trial.

Although CSX further complains that Dr. Green's testimony should not have been "limited," Dr. Green candidly acknowledged that, as a toxicologist, she was not qualified to diagnose or treat patients. Thus, she was not permitted to speculate that plaintiff might have been coming down with the "flu" or "pink-eye." She was permitted to testify about general causation and the effects of exposure to various forms of chlorine or chlorine-containing compounds. She was also permitted to testify regarding her critique of Dr. Levy's analysis and methodology, including her understanding of the various scientific articles reviewed by Dr. Levy.

Although CSX argues that Dr. Green should have been allowed to testify about the odor threshold of "chlorine gas," her expert report contained no references to this subject (doc. no. 114, Ex. 5 "Report"), and thus, the plaintiff's objection was sustained. In any event, as CSX points out, the evidence did not reflect that plaintiff was exposed to a "visible cloud" of chlorine gas with a "pungent odor." Plaintiff did not indicate he had smelled "chlorine." Rather, the evidence indicated that he had been "blasted in the face" with toilet liquid that irritated his eyes and made his "gasp" and that he then inhaled a mist of aersolized liquid for approximately thirty minutes that made him cough. The evidence

indicated that the treated effluent from the toilet contained hypochlorous acid and other compounds. The evidence indicated that the symptoms suffered by plaintiff were likely caused by the caustic nature of the chlorine-containing compounds in the liquid or "mist." Although CSX argues that the discharged effluent would be akin to "swimming pool water," this assumes that (contrary to the evidence) the toilet system was functioning properly.

Finally defendant argues that the jury should have been given CSX's proposed instruction on causation, specifically that "plaintiff must prove that the extent of his exposure to chlorine, if any, was sufficient – in terms of duration and dose – to cause RADS" (doc. no. 109 at 6, citing doc. no. 97 at 24). Relying on Pluck, 640 F.3d at 676-77, CSX sought to insert the requirement of "dose" and "duration" into the jury instructions. As already discussed, Pluck is readily distinguishable on its facts from the present case. With respect to medical causation, the present plaintiff's case is closer to Best and Gass (rather than Pluck) on the facts. See Best, 563 F.3d at 178; Gass, 558 F.3d at 434. CSX was not entitled to the requested instruction.

For all of these reasons, the jury verdict stands.

Accordingly, the defendant's "Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial" (doc. no. 108) is DENIED in all respects.

IT IS SO ORDERED.

s/Herman J. Weber
Herman J. Weber, Senior Judge
United States District Court